[Crim. No. 4989. In Bank. Sept. 29, 1949.]

THE PEOPLE, Respondent, v. ADMIRAL DEWEY ADAMSON, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, Walter L. Bowers, Assistant Attorney General, Jere Sullivan, Robert Wheeler, Deputy Attorneys General, and William E. Simpson, District Attorney, for Respondent.

SCHAUER, J.—There are before this court defendant's appeal from a judgment denying his petition for *coram nobis* and the People's motions that this court dismiss such appeal, vacate all orders staying execution of the sentence,[1] direct the trial court to proceed in the manner provided by law with execution of its sentence (which imposes the death penalty), and direct immediate issuance of the remittitur. For the reasons hereinafter stated, we have concluded that the motions of the People should be granted.

[1] The only presently existing order staying execution is an order of this court made May 4, 1949.

By his petition for *coram nobis* (which is, in legal effect, a motion to vacate a judgment [*People* v. *Adamson* (1949), 33 Cal.2d 286, 287-288 (201 P.2d 537)]) defendant attacks a judgment of conviction of first degree murder which has been affirmed by this court (*People* v. *Adamson* (1946), 27 Cal.2d 478 [165 P.2d 3]; rehearing denied) and by the United States Supreme Court (*Adamson* v. *California* (1947), 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed 1903, 171 A.L.R. 1223]; rehearing denied). He contends: That he was given only two days in which to prepare his defense and was thus deprived of the right to effective aid of counsel. That "there has been a constant and systematic exclusion of colored persons in the appointment of judges" of the Los Angeles Superior Court, wherein he was convicted, thus denying to defendant, a Negro, "due process of law and equal protection of the law." "That the mode and method of selection of jurors in Los Angeles County was such as to permit systematic and persistent exclusion of members of the colored or African race on account of race . . ., and that the jury commissioner called only white persons to attend the trial and try Admiral Dewey Adamson . . ., and that the jury selected to try your petitioner consisted entirely of women, all white. That such procedure and proceedings denied him the equal protection of the law and due process of law." That defendant was convicted upon false testimony of fingerprint experts and of Mrs. Frances Turner, used by the State with knowledge of its falsity.

The judgment attacked on the above grounds was rendered on November 27, 1944. It was affirmed on appeal on January 4, 1946 (*People* v. *Adamson, supra,* 27 Cal.2d 478); a petition for rehearing was denied on January 31, 1946; and defendant was resentenced by the trial court on February 15, 1946. On June 23, 1947, the United States Supreme Court affirmed the decision of this court (*Adamson* v. *California, supra,* 332 U.S. 46), and on October 13, 1947, that court denied a petition for rehearing. On November 18, 1947, the trial court set February 6, 1948, as the date for defendant's execution. On January 30, 1948, just one week before the date set for his execution, defendant petitioned this court for the writ of habeas corpus. The petition was denied. The United States Supreme Court denied certiorari to this court (*Adamson* v. *California* (Feb. 5, 1948), 333 U.S. 831 [68 S.Ct. 610, 92 L.Ed 1115]). Thereafter (later in the day on Feb. 5, 1948), a judge of the

United States District Court granted a stay of execution to permit consideration of a petition for habeas corpus in that court. On February 16, 1948, the district judge denied the petition for habeas corpus and on March 2, 1948, he refused a certificate of probable cause for appeal. On March 29, 1948, the trial court again fixed a date for execution: June 4, 1948. Thereafter a judge of the United States Court of Appeals for the Ninth Circuit denied defendant's application for certificate of probable cause for an appeal from the District Court order (*Ex parte Adamson* (May 11, 1948), 167 F.2d 996). The United States Supreme Court denied certiorari to the Court of Appeals (*Ex parte Adamson* (June 1, 1948), 334 U.S. 834 [68 S.Ct. 1342, 92 L.Ed. 1761]). On June 2, 1948, defendant filed his petition for *coram nobis* in the trial court and that court ordered execution stayed and issued its order to show cause why the petition should not be granted. The People then filed a ''Motion for a Denial of the Relief Prayed For'' with affidavits denying generally and controverting specifically the material allegations of the petition, and also a ''Demurrer.'' On July 12, 1948, the trial court made its order that ''Demurrer to petition . . . is sustained without leave to amend.'' Defendant attempted to appeal from this non-appealable order (see *People* v. *Adamson* (1949), *supra,* 33 Cal.2d 286). After dismissal of this purported appeal the trial court, on February 15, 1949, heard argument and rendered the ''Judgment Denying Petition for Writ of Error Coram Nobis'' from which the present appeal is taken, and set May 6, 1949, as the date of execution. On April 25, 1949, defendant filed with this court an application for stay of judgment pending appeal and, some of the justices being of the view that defendant had shown probable cause for reversal, on May 4, 1949, we granted defendant's application for stay of execution. After further consideration we are satisfied that the appeal is devoid of merit.

*The Failure to State any Ground for Relief within the Scope of the Writ of Coram Nobis*

■ In this state a motion to vacate a judgment in the nature of a petition for *coram nobis* is a remedy of narrow scope. (See *People* v. *Darcy* (1947), 79 Cal.App.2d 683, 693 [180 P.2d 752]; *People* v. *Martinez* (1948), 88 Cal.App.2d 767, 774 [199 P.2d 375].) Its purpose is to secure relief, where no other remedy exists, from a judgment rendered while there existed some fact which would have prevented its rendition

if the trial court had known it and which, through no negligence or fault of the defendant, was not then known to the court. (*People* v. *Gilbert* (1944), 25 Cal.2d 422, 442 [154 P.2d 657] ; *In re Lindley* (1947), 29 Cal.2d 709, 725-726 [177 P.2d 918] ; *People* v. *Tuthill* (1948), 32 Cal.2d 819, 821 [198 P.2d 505].) ■ The applicant for the writ "must show that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time of his motion for the writ; otherwise he has stated no ground for relief." (*People* v. *Shorts* (1948), 32 Cal.2d 502, 513 [197 P.2d 330].)

■ With expansion of the function of habeas corpus in this state, an application for that writ has become the proper remedy to attack collaterally a judgment of conviction which has been obtained in violation of fundamental constitutional rights. Thus, the appropriate writ to secure relief from a judgment of conviction obtained by the use of false testimony known by the prosecution to be false is not *coram nobis* but habeas corpus (*In re Lindley, supra,* p. 725 of 29 Cal.2d; see *People* v. *Mooney* (1918), 178 Cal. 525 [174 P. 325] ; *Mooney* v. *Holohan* (1934), 294 U.S. 103, 113 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406] ; *In re Mooney* (1937), 10 Cal.2d 1 [73 P.2d 554]), although *coram nobis* has been used for this purpose (see *People* v. *Kirk* (1946), 76 Cal.App.2d 496, 498 [173 P.2d 367]). ■ And habeas corpus, not a nonstatutory motion to vacate the judgment (in the nature of a petition for *coram nobis*), is the proper proceeding to raise the question of systematic, discriminatory exclusion of Negroes from the grand jury which indicted defendant, a Negro. (See *People* v. *Montgomery* (1942), 51 Cal.App.2d 444 [125 P.2d 108].) ■ Habeas corpus can be used to advance the contention of denial of the right to counsel, at least where no other remedy is available. (See *In re Egan* (1944), 24 Cal.2d 323, 337 [149 P.2d 693] ["It may be assumed that a petitioner would be entitled to release on habeas corpus if he could show that deprivation of counsel resulted in an unfair trial or in substance in no trial at all"] ; *In re Jingles* (1946), 27 Cal.2d 496, 498 [165 P.2d 12] [proceeds directly to consideration of the merits of the contention, without discussing whether the writ is a proper remedy] ; *In re Tedford* (1948), 31 Cal.2d 693 [192 P.2d 3] [same] ; *In re McCoy* (1948), 32 Cal.2d 73, 76 [194 P.2d 531] [habeas corpus is available where petitioner

has no other adequate remedy] ; see, also, *In re Connor* (1940), 16 Cal.2d 701, 705 [108 P.2d 10] ["Under the general rule well established in this state, but which admits of some modification under exceptional circumstances, this contention cannot at this late date be made the basis of a successful collateral attack by *habeas corpus* upon the validity of the judgment"; the contention could have been raised by direct appeal or by a nonstatutory motion to vacate the judgment].)

■ Defendant's application for the writ of *coram nobis* ignores the above summarized holdings as to the respective functions of that writ and of habeas corpus. Apparently defendant formerly recognized that in this state habeas corpus rather than *coram nobis* is the appropriate proceeding in which to raise the questions whether he was deprived of the right to counsel and whether there was discrimination against Negroes in the selection of judges and trial jurors in Los Angeles County, for he advanced these contentions in his petitions for habeas corpus addressed to this court and to the United States District Court. Defendant now repeats these contentions without suggesting any reason why he should be permitted to reiterate the same collateral attacks upon the judgment in various proceedings. Furthermore, he does not even attempt to make the showing fundamentally necessary for issuance of the writ of *coram nobis*; he does not suggest that he was diligent in advancing these contentions. The facts as to the asserted deprivation of the effective aid of counsel and the asserted discriminatory exclusion of Negroes from bench and jury either were known to defendant or in the exercise of ordinary diligence should have been known to him (at least through his counsel) at the time of trial and defendant does not attempt to show that such facts were not known to the trial court, nor does he explain his failure to raise them in orderly fashion on appeal from the judgment of conviction.

■ As to his contention that the State knowingly used perjured testimony, not only does defendant present it in this inappropriate proceeding, but he does not comply with the requirement that he show that he has exercised due diligence. "[W]here a defendant seeks to vacate a solemn judgment of conviction, particularly where such judgment has been affirmed on appeal, the showing of diligence essential to the granting of relief by way of *coram nobis* should be no less than the similar showing required in civil cases where relief is sought against lately discovered fraud. In such cases it is necessary to aver not only the probative facts upon which

the basic claim rests, but also the time and circumstances under which the facts were discovered, in order that the court can determine as a matter of law whether the litigant proceeded with due diligence; a mere allegation of the ultimate facts, or of the legal conclusion of diligence, is insufficient.'' (*People* v. *Shorts* (1948), *supra*, 32 Cal.2d 502, 513.) Defendant does not even mention the time and circumstances under which the asserted falsity of the fingerprint evidence was discovered. Nor does he mention in his petition or supporting affidavits the time and circumstances of his asserted discovery that the prosecution used Mrs. Turner's testimony with knowledge that it was false. His first and only attempt to make this essential explanation was before this court when he applied for a stay of execution. At that time he made the following vague averment: ''The perjury involved particularly the testimony of Frances Jean Turner, a white woman, and was based upon an investigation made by a detective employed by friends of the accused, as her testimony weighed not only with this Court, but the United States Supreme Court in its consideration of the sufficiency of the testimony.'' If Mrs. Turner's testimony was false, this fact was known to defendant at the time she testified, and he cannot be excused for his failure to raise the question of its falsity until after he discovered that this court and the United States Supreme Court (as appellate courts must do on appeal) gave credence to this evidence which tends to support the judgment of conviction.

### The Failure to Present Credible Allegations of Fact Which Would Constitute a Prima Facie Case in Any Form of Proceeding

The petition for *coram nobis* and supporting affidavits not only state a case wholly outside the tenable scope of the writ; they also fail to state sufficient credible facts from which the trial court (and this court) would be justified in believing that defendant had some expectance of establishing his conclusionary allegations of violations of due process of law. ■ The proceeding designated *"coram nobis"* in this state is a court-made proceeding and, within the limits of the constitutional requirements pointed out in *People* v. *Shorts* (1948), *supra*, 32 Cal.2d 502, 506, must, therefore, be subject to such limitations and procedural requirements as the creating court may prescribe. ■ Such proceeding is not subject to all the rules applicable to an original trial; it is an

attack upon a judgment which has become final and in favor of which there are strong presumptions of regularity; the "petition" is regarded as a motion to vacate the judgment; it is not a complaint nor does it initiate an independent action (*In re Paiva* (1948), 31 Cal.2d 503, 509 [190 P.2d 604]).

The facts that the People filed *inter alia* a document entitled "Demurrer" and that the trial court made an order (superseded by the order now appealed from) that the "Demurrer . . . is sustained without leave to amend" did not require the trial court and do not require this court to accept every allegation of the petition and supporting affidavits at face value. The trial court considered, and we are entitled to consider, the circumstances in which those allegations were made and the People's affidavits controverting them.

In the circumstances of the present case—a *coram nobis* attack upon a judgment which has become final after affirmance on appeal—we hold that this court, like the trial court, has "every right and the plain duty to scrutinize [defendant's claims] with a critical eye, in the light of its familiarity with the facts of this crime as they had been adduced in [the trial]." (*Hysler* v. *Florida* (1941), 315 U.S. 411, 417 [62 S.Ct. 688, 86 L.Ed. 932].) This rule is the same whether the proceeding be before us on appeal or on direct application. (See Pen. Code, § 1265.) The Hysler case concerns the Florida procedure whereby convicted defendants can, even after affirmance of the judgment on appeal, obtain relief of the sort sought here; i. e., "the judicial correction of a wrong committed in the administration of criminal justice and resulting in the deprivation of life or liberty without due process" (p. 415 of 315 U.S.). "The State's security in the just administration of its criminal law must largely rest upon the competence of its trial courts. But that does not bar the state Supreme Court from exercising the vigilance of a hardheaded consideration of appeals to it for upsetting a conviction" (p. 422 of 315 U.S.). And in giving such consideration we, like the trial court, are "not bound to accept at face value the allegations of the petition" (*Taylor* v. *Alabama* (1948), 335 U.S. 252, 262 [68 S.Ct. 1415, 92 L.Ed. 1935]).

Before discussing separately the specific contentions of defendant we note the following matters which bear upon the sincerity of the whole of his petition: He alleges, "I desire to testify at the hearing on my petition for writ of error coram nobis, or any other appropriate writ, for which

this application is being considered, on the grounds that my rights under the Fourteenth Amendment to the Constitution of the United States have been violated, and request that the court enter an order for my appearance at said hearing, or otherwise grant an opportunity so that my deposition might be taken.'' At his trial defendant chose not to testify before the jury. He was, to be sure, then confronted with a difficult choice: whether to take the stand and have prior convictions of felony disclosed to the jury, or to fail to explain or deny the evidence against him and have such failure commented upon by the prosecuting attorney and the trial court (see discussions of this problem, *People* v. *Adamson* (1946), *supra,* 27 Cal.2d 478, 494; *Adamson* v. *California* (1947), *supra,* 332 U.S. 46, 57). But we are justified in considering that defendant's belated desire to take the stand (not, it should be noted, before a jury, but only before a judge) is not because of any belief that he can give testimony relevant to the asserted deprivations of constitutional rights (the allegations of his petition and affidavit show that he can give very little testimony in this connection) but only to secure further delay.

We are justified also in considering that defendant, after having set forth in his petition all the contentions above stated (*ante,* p. 325), has on this appeal seen fit to confine his argument to one contention: that his allegations as to the falsity of Mrs. Turner's testimony required that the question of fact be tried out. Yet examination of the record of the trial discloses that, of all the matters complained of in his petition, the testimony of Mrs. Turner is by far the least important. Furthermore we note that defendant is under sentence for four burglaries unconnected in their commission with the murder here under consideration, and that such four convictions rest upon fingerprint evidence of precisely the same character as that questioned here and were obtained before the same judge and the verdicts were rendered by a jury selected in the same manner as in the murder case. Defendant is also under sentence for a burglary connected in its commission with the murder; the verdict of guilty of that burglary rests upon precisely the same evidence and was rendered in the same trial as the verdict of guilty of murder. Yet it is only the conviction of murder, carrying with it the death penalty, which defendant has questioned. We are entitled to question the sincerity of contentions directed only to the judgment which would deprive defendant of life and

not, as they could be, to those judgments which deprive him of liberty.

 We note, also, the lengthy history of attacks upon the judgment of death (*ante,* pp. 325-326) and the fact that at all times since defendant went to trial on the murder charge he has been represented by experienced and devoted counsel of his selection. In these circumstances we cannot accept his allegations that he is "poor" and "ignorant" as an excuse for his failure to present a convincing factual showing in support of his conclusionary allegations of want of due process.

### Deprivation of Effective Aid of Counsel

As to this contention the records on appeal from the judgment of conviction and the judgment denying the petition for *coram nobis* show the following:

Defendant was arrested on August 24, 1944. A few days later, according to a police officer, defendant said, "When the time comes I will have my witnesses there to prove [an alibi defense], and I will be defended by one of the best attorneys in Los Angeles"; on August 28 and August 31, defendant made similar statements to the officer.

At the preliminary hearing defendant was represented by Mr. Ward Sullivan. The information was filed September 14, 1944. On September 18, 1944, defendant appeared for arraignment without counsel; the public defender was appointed to represent him and trial was set for November 9, 1944. On October 3, 1944, the public defender was allowed to withdraw as counsel for defendant. Defendant has not attempted to explain why Mr. Sullivan withdrew from the case; we cannot assume that he withdrew in violation of his duty and against defendant's wishes. The only attempt to explain why the public defender withdrew from the case appears in an affidavit of Mr. Milton Safier, who represented defendant at the trial. Mr. Safier avers that defendant "informed me that the court . . . without his wishes or consent, appointed a Deputy Public Defender to represent him but that the Deputy Public Defender, named Richard Bird, was not an attorney of his choice; that he knew nothing about Richard Bird's ability; that Richard Bird was unsatisfactory to him . . . That he wanted counsel of his own choice and counsel chosen by Loyd Wright, . . . with his approval and consent." Of course defendant's right to counsel does not include the right to postpone the trial of a case indefinitely and reject the services of the public de-

fender while defendant, at his leisure, attempts to find counsel who will serve without charge and of whom defendant and Mr. Wright approve. (See *People* v. *Manchetti* (1946), 29 Cal.2d 452, 458 [175 P.2d 533], and cases there cited.)

██ This court can take judicial notice, too, that it would be difficult to find in California any lawyers more experienced or better qualified in defending criminal cases than the Public Defender of Los Angeles County and his staff.

██ Mr. Safier, an associate of Mr. Morris Lavine, undertook to represent defendant on November 6, 1944, pursuant to a request of Mr. Wright made to Mr. Lavine. On November 6, Mr. Safier requested and was refused a continuance. Four charges of burglaries unrelated to the murder went to trial on November 9, 1944; on this trial defendant was represented by both the public defender and Mr. Safier. On November 14, when the trial of these four charges ended, the trial for murder and the burglary connected therewith commenced at once, with Mr. Safier representing defendant. Defendant did not testify and produced no witnesses.

Defendant alleges that he gave Mr. Safier "the names of eleven persons whose testimony he said was vital, some of whose addresses he furnished and others whose addresses he could not furnish, most of which witnesses Adamson said could establish an alibi defense," but there was insufficient time for Mr. Safier to locate and interview these witnesses. However, defendant has not seen fit to identify these witnesses or to suggest what their testimony would be, other than alleging that at about the time the murder was being committed he was with his brother and mother and thereafter he "talked with Mrs. Robbie Babinean." In this proceeding we need not be so credulous as to believe that, because Mr. Safier did not have more time to prepare a defense, defendant could not produce his mother and brother as witnesses.

*Asserted Systematic Exclusion of Negroes From the Los Angeles Superior Court Bench and Jury Panel*

██ The petition contains no suggestion of the manner in which defendant hoped to prove these allegations. When they were presented to the trial judge on argument as to the petition, he stated, "I don't believe you can prove anything of that sort." We are justified in concluding that defendant's counsel agreed with this statement, for he made no attempt in the trial court and has made no attempt in this court to show that he has any expectance of establishing the allegations.

## The Fingerprint Evidence

Defendant has not suggested that he can produce any evidentiary facts to support the alleged conclusion that the fingerprint evidence was false and that the People knew of its falsity. Shortly after the beginning of testimony on the morning of the murder trial, the prosecuting attorney said that "when we tried the other case against this defendant [the four burglary charges not connected in their commission with the offenses now under consideration] it involved finger print testimony . . . and counsel, in commenting to the jury in that case, mentioned the fact that finger print experts were expensive"; that the same fingerprint expert would testify for the People in the present case. The prosecuting attorney requested and the trial court agreed that the court appoint as its own witness some expert who had had no connection with the case. The judge stated that he would appoint any qualified expert whom defendant's counsel suggested. Defendant's counsel suggested Mr. Chester Allen. The judge replied that he knew Mr. Allen and did not wish to appoint him because he had not been in fingerprint work for some 20 years. Appointment of the court's witness was postponed to give defendant's counsel an opportunity to find a qualified expert. He was apparently unable to find one satisfactory to him, and the court appointed Harry Rogers of the sheriff's office. Mr. Rogers compared fingerprints found in deceased's apartment with defendant's prints, came to the conclusion that the prints found in the apartment were those of defendant, and so testified at the trial.

On argument in the trial court as to the petition for *coram nobis* defendant produced as a witness the above mentioned Mr. Allen. Mr. Allen was permitted to take the stand rather than to give a supporting affidavit. He testified that he had not been active in fingerprint work for 19 years and did not believe that he could qualify as an expert. Therefore, he was not allowed to give any evidence as to the comparison of the prints. (The averments as to the falsity of the fingerprint evidence are contradicted by affidavits, filed in opposition to the petition for *coram nobis,* of the deputy district attorney who prosecuted defendant, the fingerprint expert who testified for the People, the court-appointed fingerprint expert, the two police officers who investigated the homicide, the officer who originally found and photographed the fingerprints in deceased's apartment, and the officer who first entered deceased's apartment after the killing.)

The fingerprints identified as defendant's at the trial were there described by the experts as "latent." In his affidavit defendant avers upon information and belief that "latent finger prints, unlike other types of finger prints, are inaccurate and subject to many combinations and discrepancies and falsehoods; that these facts were known to the State." "Latent" prints, according to the expert testimony at the trial (and this defendant does not question), are simply prints left when the finger, slightly oily and damp with ordinary body secretions, touches a reasonably clean, smooth surface, i. e., the type of prints which constitute an essential part of the basis for virtually all fingerprint identification insofar as connecting a defendant with a particular crime is concerned. In the absence of any suggestion of evidentiary facts to that effect, we need not believe that defendant has discovered evidence tending to show that practically all expert testimony as to such fingerprint identification is false or mistaken or unreliable.

### The Testimony of Mrs. Turner

Although, as stated above, this is the only point which defendant has argued to this court, his petition minimizes its importance by averring that "defendant was convicted principally, if not solely, upon [the fingerprint] evidence."

The murder was committed and deceased's diamond rings disappeared about July 25, 1944. The witness Turner testi-fied that at a time between the 10th and the 14th of August, 1944, she overheard defendant ask an unidentified man in a bar whether he would like to buy a diamond ring. In his affidavit defendant avers on information and belief that Mrs. Turner's husband was "under investigation for theft" and that she agreed to testify as the People wished in return for a promise that her husband would not be prosecuted. An affidavit of Mr. Harold Gaines contains the only direct allegations of evidentiary facts tending to support defendant's assertion that the People knowingly used false testimony. Such allegations are: About two days before Mrs. Turner testified at the trial of Adamson, Gaines saw her at a bar with a man unknown to Gaines. Thereafter, Mrs. Turner told Gaines that the man was "the District Attorney" and that "she did not know why the District Attorney wanted her to testify in Dewey's case, because she didn't know anything about it." The next morning, while Gaines was at Mrs. Turner's home, a man arrived and said that "he wanted her to

go down town with him to the District Attorney's office.'' Mrs. Turner left with this man. She returned with the same man and told Gaines that in the district attorney's office she had been shown ''some horrible pictures of a deceased woman . . . ; that they told her that was what they had Dewey for.'' She asked Gaines ''what date it was that Dewey wanted to sell Tim the rings.'' Gaines replied that he had not been present on any such occasion. ''Then Frances Jean Turner said perhaps she was mistaken, whereupon the man from the District Attorney's office told her not to mention anything about dates.'' After defendant's conviction Mrs. Turner told Gaines ''that at the time she gave her testimony in the case she thought she was testifying for Dewey and testified exactly to what she had been told to say.'' (In opposition to the petition for *coram nobis* the People filed an affidavit of Mrs. Turner that her testimony ''was true at the time it was given at said trial and is now true.'')

At the time of argument on the petition Mrs. Turner, who had been subpoenaed by Mr. Lavine, was present in the court-room. However, since the trial court concluded that the petition and supporting affidavits did not require the trying out of issues of fact, he did not permit defendant to call Mrs. Turner to the stand. Independently reappraising the credibility and effect of the Gaines affidavit in the light of all the facts before us, we conclude that such affidavit does not sufficiently show a deprivation of due process. Defendant has not attempted to explain why, although he must have known that Mrs. Turner's testimony was false (if it was false) at the time it was given, he did not raise this point until, nearly three years and nine months after he was convicted, he filed his petition for *coram nobis*. We are not informed who Mr. Gaines is or why years elapsed between the trial and the making of his affidavit. The averments of the Gaines affidavit do not support the assertion, found only in the affidavit of defendant and only upon information and belief, that Mrs. Turner gave false testimony in return for a promise by an unidentified officer of the State that her husband would not be prosecuted for theft. In striking contrast to the lack of allegations concerning the discovery of the relevant facts averred in the Gaines affidavit, are defendant's detailed, lengthy allegations as to other matters, some unimportant, some incompetent, and practically all known to defendant at the time of his trial, concerning Mrs. Turner and her testimony. Defendant devotes a large portion of his petition and

affidavit to describing a casual social meeting of Mrs. Turner and defendant which took place after the murder and before defendant's arrest and which has no connection with the crime. The petition and supporting affidavits contain a number of allegations such as the following: Defendant's counsel avers on information and belief that after defendant's conviction an unidentified person interviewed, by telephone, one Dauzat, owner of the bar where, according to Mrs. Turner's testimony, she overheard defendant's conversation regarding rings, and Dauzat "inferred to the interviewer that this woman was not a person of reputable character. He also stated that petitioner Adamson frequently came into the place and was not a drinking man, preferring coca-cola, and that he never knew Adamson to be other than a perfect gentleman; that throughout his experience in this type of business he found that when a party wanted to make some kind of a deal he would not discuss it at the bar, where talk could be overheard, he would do so in a private conversation, and that from his association with petitioner Adamson and his observation of Adamson while in the establishment, he was of the opinion that Adamson would not think of discussing any business at the bar. He further stated that he does not believe that Frances Turner ever heard Adamson in this diamond ring conversation, but thinks that she testified as she did because she wanted to clear herself from any association with colored men." Harold Gaines avers in his affidavit that "During all of the time I have known Frances Jean Turner I have known her to be a steady drinker and a confirmed drunkard and a person who sought the limelight." Defendant avers in his affidavit that Mrs. Turner "was a white woman who had been out with Dewey Adamson, had visited his home and that she had had drinks with the said Dewey Adamson." These and similar averments, incompetent to establish defendant's contention that Mrs. Turner perjured herself, are relevant to a determination of the sincerity with which that contention is advanced. By seeking to buttress a contention of deprivation of due process with allegations such as those last quoted, defendant and his counsel indicate a desperate resolve to delay execution of judgment rather than a sincere attempt to present a serious question of fact and law.

Upon the showing made to us nearly five years after the judgment of conviction was rendered, we conclude that "it is asking entirely too much of the court to believe" the alle-

gations of the petition and supporting affidavits (see *Taylor* v. *Alabama* (1947), *supra,* 335 U.S. 252, 271); we can only believe that this proceeding in the nature of an application for *coram nobis* and the appeal therefrom have had as their object nothing more than delay in the execution of the judgment under attack.

For the reasons above stated, the stay of execution heretofore granted is terminated, the appeal from the judgment denying the petition for *coram nobis* is dismissed, and the trial court is directed to proceed with execution of its sentence in the manner provided by law. (See *People* v. *Shorts* (1948), *supra,* 32 Cal.2d 502, 518.) Let the remittitur issue forthwith.

Gibson, C. J., Shenk, J., Traynor, J., and Spence, J., concurred.

EDMONDS, J.—I concur in the judgment solely upon the ground that relief by *coram nobis* was properly denied because habeas corpus is the available and proper remedy. The courts developed the modern use of the writ of error *coram nobis* in an era when it furnished the *only remedy* for reviewing certain serious errors. However, in recent years, generally speaking, habeas corpus has been made available for the correction of errors within the category of lack of procedural due process of law. (*In re McCoy,* 32 Cal.2d 73 [194 P.2d 531]; *In re Jingles,* 27 Cal.2d 496 [165 P.2d 12]; *In re Mooney,* 10 Cal.2d 1 [73 P.2d 554].) Accordingly, the compelling necessity for the use of a writ of error *coram nobis* is no longer present. Moreover, the enlarged use of habeas corpus avoids the necessity for the time consuming practice of making an application for relief in the trial court followed by an appeal from an adverse determination.* (See *People* v. *Nixon, ante,* p. 234 [209 P.2d 385]; *People* v. *Shorts,* 32 Cal.2d 502 [197 P.2d 330].)

The effect of the present decision is to foreclose in the future most, if not all, of the present uses of the writ of error *coram nobis,* for there are no significant situations where that writ might be used in which habeas corpus is not now available. This result reflects sound policy directed to protection of the rights of persons improperly convicted, and at the same time expedites the efficient administration of justice.

*The 1949 amendment to section 1265 of the Penal Code has avoided some of the present procedural steps. (Stats. 1949, ch. 1309 [A.B. 2575].)

I do not agree with the protracted discussion in the majority opinion as to the procedure for obtaining *coram nobis* and the nature of the proceeding. (See dissent, *In re Paiva,* 31 Cal.2d 503 at 511 [190 P.2d 604].) The opinion holds that "[w]ith the expansion of the function of habeas corpus in this state, an application for that writ has become the proper remedy to attack collaterally a judgment of conviction which has been obtained in violation of fundamental constitutional rights." By that rule, the modern use of the writ of error *coram nobis* is judicially "repealed" and it is entirely unnecessary to discuss rules of pleading applicable to a proceeding which it is said may not be maintained. If consideration of those principles were proper, I would state my reasons for disagreeing with much of what is stated.

CARTER, J.—I dissent.

While it may be true that defendant has failed to allege sufficient facts to show due diligence—why he did not discover sooner the basis for his attack on the judgment and proceed accordingly, yet the demurrer to his petition should not have been sustained without leave to amend. He may be able to allege facts which would show diligence and should be given the opportunity to do so. Those comments are also applicable to the other alleged defects in the petition and affidavits of petitioner. But in addition to the foregoing, I do not believe it is the function of this court to pass upon the credibility and "sincerity" of petitioner's pleadings. Likewise, the trial court should not do so in ruling on a demurrer.

This court is merely reviewing the action of the trial court in sustaining a demurrer interposed by the People. In so doing it must give full weight to the trial court's determination the same as in any other case. The majority opinion gives no reason and cites no authority for the unique proposition that a different rule applies to the pleadings in a *coram nobis* proceeding than that applicable to pleadings in other proceedings. The majority opinion is replete with statements that the allegations cannot be believed, that they are not sincere, that they are mere conclusions and the like. On demurrer all the pleaded facts must be taken as true—must be believed. That is especially true where the demurrer is general. Moreover, they must be liberally construed. (*Hudson* v. *Craft,* 33 Cal.2d 654 [204 P.2d 1].) Certainly when a man's life is in the balance and constitutional issues are raised, the rule of

liberal construction is even more imperative than in the ordinary case. It is said in *People* v. *Long*, 346 Ill. 646 [178 N.E. 918, 919] : ''The facts set out were sufficiently definite to raise the issue of whether the plea of guilty was entered through an excusable mistake or ignorance of the accused, and whether he was deprived of a substantial defense which he might have urged on his trial. Under such circumstances, the trial court could not arbitrarily refuse a full hearing upon the petition. The allegations of a petition need be only prima facie sufficient for the granting of such a hearing.'' (See, also, *Howie* v. *State*, 121 Miss. 197 [83 So. 158, 10 A.L.R. 205].)

If the facts stated in the petition and affidavits, taken at their face value, are insufficient as a matter of law to constitute a ground or basis for relief, the demurrer should have been sustained, and, in the absence of an amendment setting forth further facts, that should be the end of the story. The discussion in the majority opinion relative to the good faith and sincerity of petitioner and his counsel in making the statements contained in the petition and affidavits, goes entirely beyond the scope of the review which this court is called upon to make in deciding the issue presented by this appeal.

I would reverse the judgment and direct the trial court to permit petitioner to amend his petition if he be so advised.