[Crim. No. 4415. In Bank. June 5, 1944.]

In re FRANK EGAN, on Behalf of FRANK EGAN and ALBERT TINNIN, on Habeas Corpus.

Charles Bagby, John C. Jury, Francis C. Mackall and Elizabeth Cassidy for Petitioners.

Earl Warren, Attorney General, Robert W. Kenny, Attorney General, W. T. Sweigert, Assistant Attorney General, David K. Lener, Deputy Attorney General, Matthew Brady, District Attorney (San Francisco), and Leslie C. Gillen, Assistant District Attorney, for Respondent.

SHENK, J.—On February 2, 1942, Frank Egan, on behalf of himself and Albert Tinnin, filed in this court a petition for writs of habeas corpus. Egan is confined in the State Prison at San Quentin, and Tinnin in the State Prison at Folsom. The wardens of those prisons are the respondents. Egan and Tinnin are under sentences of life imprisonment for the murder of Mrs. Jessie Scott Hughes in April 1932. Also implicated in the homicide was Verne Doran, a con-

fessed accomplice, who turned state's evidence, and whose case was brought on for trial after the conviction of Egan and Tinnin. On the joint trial of Egan and Tinnin, Doran was examined under oath. This evidence, together with evidence of other circumstances connecting Egan and Tinnin with the commission of the crime, was, on the appeal of Tinnin, held sufficient to support the verdict. (*People* v. *Tinnin,* 136 Cal.App. 301 [28 P.2d 951].) The appeal of Egan was dismissed for failure to prosecute. (*People* v. *Egan,* 135 Cal. App. 479 [27 P.2d 412].) The opinion of the District Court of Appeal in the case of *People* v. *Tinnin, supra,* is referred to for a more extended recital of the facts leading to the trial and conviction of Egan and Tinnin, who will be referred to as the petitioners. A very brief résumé of the facts shown therein will suffice for the purposes of this proceeding.

In 1932 Frank Egan had been public defender of the city and county of San Francisco for a number of years. Acting as her attorney and business adviser, Egan managed the financial affairs of Mrs. Jessie Scott Hughes, who was a widow of 57 years at the time of her death. She had been the friend and benefactress of Egan since his youth. Egan had defended and befriended Tinnin and Doran, both of whom had criminal records, had served time for commission of felonies, and in 1932 were on parole. Egan became involved in his own and Mrs. Hughes' financial affairs. The three men connived and Tinnin and Doran executed a plan to dispose of Mrs. Hughes by attacking her in the basement of her home, running a heavy automobile over her body until she was dead, and then throwing the body into the street to make it appear that she had been the victim of a "hit and run" accident.

The petitioners were convicted and were committed on October 1, 1932. Doran pleaded guilty to manslaughter and was sentenced to San Quentin to serve the term prescribed by law. He was released on parole in November 1934.

In August 1938 Egan filed a petition for the writ of habeas corpus based in part on the alleged perjured testimony of Doran. The petition was denied by this court on September 15, 1938.

The petitioners now assert that on their trial for the murder of Jessie Scott Hughes they were denied due process of law, first, in that their convictions were obtained by the perjured testimony of Verne Doran and others, the falsity of

whose testimony was known to the prosecuting officials; and, second, in that the petitioner Frank Egan was unlawfully deprived of the assistance of counsel during the prosecution's closing argument to the jury.

On February 26, 1942, this court issued writs of habeas corpus returnable on March 5th following. On the return date the attorney general filed returns to the writs. By stipulation the petition was deemed a traverse to the returns. On March 9, 1942, this court made an order appointing the Honorable Edward I. Butler, judge of the Superior Court in and for the County of Marin, as referee to hear and record the testimony of witnesses to be examined, the examination, and findings and conclusions to be made and filed, to be directed to the issues involved in the proceeding, as follows:

1. Did any witness who testified against Frank Egan or Albert Tinnin in the trial which led to their convictions on the charges for which they are now deprived of their liberty, commit perjury as defined in section 118 of the Penal Code of the State of California, that is, did such witness testify to any material matter which he knew to be false?

2. In the event that such witness or witnesses did commit perjury, as so defined, did the representatives of the State of California, the district attorney, or any of his deputies or assistants cause or suffer such testimony to be introduced knowing that such testimony as given was perjured?

3. Was the petitioner, Frank Egan, deprived of the assistance of counsel for his defense during the trial which led to his conviction on the charge for which he is now deprived of his liberty?

The referee entered upon the discharge of his duties and held numerous hearings commencing on March 20, 1942, and concluding on May 26, 1943. On the last hearing time was allowed for the submission of briefs. During the hearings numerous witnesses were examined, including Egan, Tinnin and Doran, in person. The transcript of the oral testimony taken before the referee comprises 555 pages. By stipulation and order the deposition of Herbert Emerson Wilson was taken on oral interrogatories at London, Ontario, before the Registrar of the Supreme Court of Ontario, Dominion of Canada, during May 18, 1942, and subsequent days. Present at and participating in the taking of that deposition were David K. Lener, deputy attorney general of this state, Leslie

C. Gillen, assistant district attorney of the city and county of San Francisco, and John Clare Jury, counsel then of record for the petitioners. That deposition comprises 96 thirty-line pages, and if transcribed under our rules would comprise approximately 130 pages. Reference to this record is made for the purpose of indicating the extent to which the issues involved in the proceeding have been explored by the parties before the referee, and also the task of the referee in preparing and making his report. On March 29, 1943, Egan dismissed in writing his attorney of record, John Clare Jury. On May 24, 1943, Egan, in propria persona, filed with the clerk of this court a document entitled, ''Motion to Terminate This Continuing Miscarriage of Justice and Suspension of Writ of Habeas Corpus and Denial of Due Process of Law.'' The grounds of the motion are not stated, but it is gleaned from the recitals in the document that this petitioner was convinced that the proceeding before the referee had been unduly prolonged; that the referee entertained bias toward him, and that counsel for the State were guilty of conduct prejudicial to his interest. The prayer for relief was that this court immediately set aside the reference and reassume exclusive charge of the proceeding. Tinnin did not join in this proposed motion but under date of December 8, 1943, his new counsel, Elizabeth Cassidy, filed an affidavit and request to have the briefs and other documents filed on behalf of Egan considered also on behalf of Tinnin so far as applicable. The request was granted; but the motion to terminate may not prevail for the reason that the court, upon the filing of the record and the report of the referee, assumed exclusive control of the proceeding and set the same for hearing on December 9, 1943; and for the further reason that the record does not support the charge of bias on the part of the referee or the charge of misconduct on the part of the attorneys representing the respondents.

The referee filed his report on September 13, 1943. Before its content is further noted, another motion of the pertitioner Egan, filed October 18, 1943, should be disposed of. The document is entitled, ''Motion to Strike 'Answers and Returns to Writ of Habeas Corpus' and 'Affidavits in Opposition to said Petition.' '' It was filed by Egan on his own behalf and on behalf of Tinnin. The respondents object to the consideration of the motion insofar as it applies to Tinnin on the

ground that it was not signed by Tinnin, that Egan has been disbarred (December 29, 1933), and therefore has no authority to appear for him. The objections may be disregarded for two reasons, first, the document may properly be included among those documents filed by Egan and deemed to be filed also on behalf of Tinnin; and secondly, the proceeding may be maintained either by the person for whose interest it is intended or by some person in his behalf. (Pen. Code, § 1474.) In filing the petition in behalf of Tinnin as well as himself, Egan did not purport to represent Tinnin as his counsel but, it must be assumed, under the authority of the Penal Code section.

The motion is 39 pages long, specifies 15 grounds in its support and is accompanied by a brief of 81 additional pages. Many of the grounds need not be separately discussed. They are answered briefly by the following conclusions which they elicit.

The answer and return of the respondents was filed on March 5, 1942. It contained a statement of the commitments of Egan and Tinnin, with copies of the judgments and commitments. It also contained affidavits of numerous persons, including Verne L. Doran, Charles W. Dullea, Matthew Brady, John R. Golden, William J. Quinn, Theodore J. Roche, Gerald J. Kenny, Walter McGovern, members of the public defender's office and police department, and other individuals. Under the stipulation, the petition was a traverse to the return.

The action which the petitioners may take upon the filing of the return is specified in section 1484 of the Penal Code. They may deny or controvert any of the material facts or matters set forth in the return, or except to the sufficiency thereof, or allege any facts to show either that their imprisonment or detention is unlawful, or that they are entitled to their discharge. The section further provides that the court or judge must thereupon proceed in a summary way to hear such proof as may be produced against the imprisonment or detention, or in favor of the same, and to dispose of the party as the justice of the case requires, with full power and authority to require and compel the attendance of witnesses, and to do and perform all other acts and things necessary to a full and fair hearing and determination of the case. The only step taken by the petitioners upon the filing of the re-

turn was to stipulate that their petition be considered a denial of the matters set up in the return. The petitioners did not make the present objections to the return until full hearings had been had before the referee and more than a month after the filing of the referee's report. Objection to the return made at such time is not in accordance with the requirements of the Code and comes too late.

Assuming timeliness, however, it also appears that an objection that the general denial in the return was insufficient to meet the issues tendered by the petition may not be made. ■ The function of the petition is to obtain the issuance of the writ. ■ The return is not to the petition, but to the writ. ■ Issues are thereupon joined by denial or other controversion of the material matters set forth in the return (Pen. Code, § 1484), and were so joined in this case by the petition, considered as a traverse to the return pursuant to the stipulation. Thereupon, the petition being considered the answer, allegations as to any new matter therein are deemed denied. By analogy, the return is the complaint and the traverse (the petition) is the answer. New matter set up in the answer is deemed denied and must be proved by the parties alleging it, namely the petitioners. (*In re Collins*, 151 Cal. 340, 342, 343 [90 P. 827, 91 P. 397, 129 Am.St.Rep. 122].)

■ By the motion it was sought to strike the affidavits appended to the return, either in whole or in part, for various stated reasons. It is a further sufficient answer to such a motion made at this time to note that this court did not proceed upon the affidavits filed, but appointed a referee to take testimony and report his findings. The report of the referee and the determination of the issues of fact by this court were and are based, not on the affidavits on file, but on the facts appearing from the testimony taken pursuant to the reference.

■ No merit attaches to the objection that the copies of the commitments of Egan and Tinnin included in the return were not certified by the proper official or were not certified at all. Subdivision 3 of section 1480 of the Penal Code requires that a copy of the commitment must be annexed to the return and the original produced and exhibited to the court or judge on the hearing. A copy of each commitment was also included in the petition of Egan and Tinnin. The petitioners thereby admitted authenticity, and no objection is

made that evidence of the authority by which the petitioners were held was improper. ■ Furthermore, Mark E. Noon, then secretary of the Board of Prison Terms and Paroles at San Quentin, who certified the copy of Egan's commitment, was the official custodian of the prison records of which the commitment was a part, and was therefore a proper person to certify to the correctness of a copy thereof pursuant to section 969b of the Penal Code.

■ As a further ground of the motion the petitioners appear to claim some infringement of their rights by reason of the fact that they or their counsel were not present at certain proceedings before the referee. At a session called for August 14, 1942, neither Egan nor Tinnin was present. Their presence was waived by their counsel and that waiver was accepted by the referee. All that transpired was a reading of the deposition of Herbert Emerson Wilson and the interposition of objections of counsel and the referee's rulings thereon. No good purpose could have been subserved by the presence of the petitioners on that day under the circumstances, and in the absence of prejudice to their rights, and none is shown, the agreement of their counsel to proceed without their presence, acted on by the referee, must be deemed binding upon them. (See 29 C.J. p. 160, § 183, and cases cited.) On Saturday, January 23, 1943, the petitioners were not present. However, no hearing was had on that day. The referee declined to go on with the hearing without the presence of the petitioners. The transcript shows that all that occurred was a discussion between the referee and counsel as to possible means of obtaining the reappearance for further interrogation of Verne L. Doran who had journeyed to Ogden, Utah, in the course of his employment in defense construction, and the postponement of the hearing until February 8, 1943. It was of no moment that the petitioners were not present. Their presence was not necessary for the mere purpose of a postponement. The petitioners appeared on February 8 following, but their respective counsel were absent. No hearing was had on that day. The referee merely informed the petitioners that their counsel had telephoned the message that Verne L. Doran had not yet arrived, and as the date of his arrival appeared to be uncertain, further hearing would be postponed until February 18th.

There is no substantial merit in any of the grounds of the motion to strike and the motion is therefore denied.

In his report the referee found against the contentions of the petitioners on all issues. The petitioners in person filed their objections to the report, and their counsel have filed briefs with particular reference to the issue whether Egan was deprived of the assistance of counsel during the trial. The report and findings of the referee and the objections thereto have been considered but the findings and conclusions hereinafter expressed are based on an independent examination of the evidence.

### The Issues Relating to False Testimony.

■ The basis of the petitioner's allegations that false testimony was given on their trial is an unsigned forty-four page statement annexed to the petition as Exhibit "J," which purports to have been drafted between the latter part of 1933 and November 1934 by an inmate of San Quentin named Herbert Emerson Wilson from data claimed to have been written on sheets of paper and handed to him by Doran.

When Doran, a young man, arrived at San Quentin, he was assigned to Dormitory No. 2, designated the "old man's dormitory," and placed under "protection," that is, apart from the inmates of the prison who might molest him for having turned state's evidence. Dormitory No. 2 and its yard were separated from the other premises by an iron gate, usually kept locked, and a screen door. However, Doran could have entered the other yard, where Egan was detained. Wilson testified that he observed Egan and Doran conversing together frequently, and that the captain had given them permission to talk. Egan testified that he talked to Doran almost daily after the first meeting with him in the latter part of 1933 when he said Doran told him he had something to disclose. Subsequently, so Egan asserts, Doran informed him that he was going to make a statement to the effect that his (Doran's) testimony at the trial was perjured, and that he was forced into giving the false testimony by the prosecuting officials. Egan admittedly took this apparently sensational news calmly, did not report it, and merely said to Doran, "It is your story—let your conscience be your guide." Wilson testified that he discussed the statement ten or more times with Egan, but that he received all the information concerning the facts from longhand or typewritten notes pre-

pared by Doran which he, Wilson, embodied in the story with his own phraseology and composition. Egan states that he helped Doran only to the extent of identifying some of the dates and the figures involved in the proposed narrative.

At the time Wilson's deposition was taken he was past sixty-one years of age. In his youth he attended the public grammar schools in London, Ontario. He studied theology in that city, worked as an evangelist and as superintendent of a city mission which he founded. He then came to the United States where he continued his theological studies in Portland, Oregon. He also studied law for one year in Los Angeles. When he was about seventeen and living in London, Ontario, he was convicted of taking money from a grocery store, a felony, and served six months in a juvenile institution. In 1922, in Los Angeles County, he was convicted of the murder of one Cox, sentenced to life imprisonment, and committed to San Quentin where he served twelve years. In June 1935 he was paroled for deportation in consideration of having given information concerning the perpetration of mail robberies in the United States and as to which he, with others, had been informed against. In 1935 he returned to London, Ontario, where subsequently he was convicted of defrauding a finance company in a matter involving approximately $100,000, and served time in the penitentiary in Ontario.

Doran first met Wilson in the fall of 1933 when the latter was assigned to "take charge" of Dormitory No. 2. According to Wilson's own testimony, he has been a prolific writer of books, short stories, articles, poems, and essays. He testified that Doran knew of his activities in that respect, had read one or two of his book-length manuscripts, and was impressed by his style and his "ability to give expression to things in a lucid way"; that Doran, in October 1933, approached him on the subject of the preparation of a statement; that Doran said he felt a little depressed at times because of his part in the conviction of Frank Egan; that he wanted to make a statement; that he "requested me to help him to get his story in shape"; that at the request of Doran he prepared the statement, Exhibit "J," for future publication in an American periodical, Wilson and Doran to share equally in the royalties; that Doran said as soon as he was released he would take a boat, enter Canada by way of Bos-

ton, and sign the statement after he was out of the jurisdiction of the United States.

Wilson testified that Doran stated on at least a dozen different occasions, at some of which Egan was present, that both Egan and Tinnin were innocent of any connection with the crime and that he alone was responsible for the death of Mrs. Jessie Scott Hughes. The statement, Exhibit ''J,'' does not contain the details of the crime, but it was Wilson's testimony that Doran said he would annex them to the proposed publication when he was safely domiciled in Canada.

Wilson also testified that he completed the statement and had it in shape for publication in May 1934. The statement purports to set forth a dramatic conspiracy on the part of the prosecuting officials and the judge presiding at the trial to implicate Egan and Tinnin in the commission of the crime. It contains recitals of day and night ''third degree'' torture and threats of personal harm and death by hanging, all designed to compel Doran to ''play ball'' with the police department and the district attorney's office. It states that as a consequence Doran gave false testimony at the trial of Egan and Tinnin; that the falsity of his and others' testimony was known to the prosecution; that the wrong done by him was at the demand and insistence of Mr. Golden, Mr. Dullea, Mr. Brady, and Superior Judge Frank H. Dunne who presided at the trial.

After his release on parole Doran made a trip on a boat through the Panama Canal. He communicated with Wilson while the latter was still in San Quentin. But Doran did not enter Canada, apparently did not see Wilson again, and the statement, Exhibit ''J,'' was neither signed nor published. In December 1938 Doran submitted to an interview with one of the attorneys for Egan and Tinnin in the presence of Captain (now Chief) Dullea in which he was informed that the statute of limitations would prevent prosecution on any charge of perjury growing out of his testimony at the trial, but Doran then stated that his testimony at the trial was true. In his appearances before the referee under oath Doran denied that he had had any conversations with Wilson or Egan in regard to any such purported disclosure or any connection with the statement, and reaffirmed the truth of his testimony at the trial. There is therefore in the record of this proceeding no evidence whatsoever that the statement,

Exhibit "J," was the statement of Doran, except the oral testimony of Wilson and Egan. Wilson could not produce even a scrap of paper showing any notes prepared by Doran. Although he said Doran made numerous alterations in the daily drafts composed by Wilson, the latter was unable to point to a single place in the forty-four pages where such a correction or alteration had been made. Wilson and Egan testified that Doran was given a copy of the statement and that he took it with him when he left the prison. It was the custom to have a prisoner's effects packed by others, but there is no evidence that the statement was seen by any one, except the assertion by Wilson that he saw it when he carried Doran's effects into the lieutenant's office. Egan testified that he was in the lieutenant's office and handled the effects after Wilson's part in handling them, but he was unable to say that he saw the statement.

In short, there is no evidence confirming Wilson's or Egan's declaration that the unsigned statement proceeded from Doran. Doran denies any participation in its preparation, and he and others deny the truth of any of the charges of falsity or knowledge of falsity included therein. On such a record there is no basis whatsoever for a tenable conclusion that the petitioners or either of them were convicted on testimony as to any material matter which was false, or that the prosecuting officials or any other representatives of the State suffered the introduction of false testimony knowing it to be false. (See *Mooney* v. *Holohan*, 294 U.S. 103 [55 S.Ct. 340, 79 L.Ed. 791, 98 A.L.R. 406]; *In re Mooney*, 10 Cal.2d 1 [73 P.2d 554].)

### The Issue Relating to Deprivation of Counsel.

The joint trial of Egan and Tinnin was commenced on August 8, 1932, before the court and jury, the Honorable Frank H. Dunne, presiding. Egan was represented by Vincent Hallinan and Tinnin by Nathan Coghlan. About four o'clock on the afternoon of September 2, 1932, Isadore M. Golden, Assistant District Attorney in charge of the prosecution, was engaged in the last few minutes of his closing argument when the court declared Egan's attorney, Hallinan, in contempt of court for "extremely and unduly loud, boisterous, harsh, offensive and contemptuous" interruptions, for

breaching the peace of the judicial proceeding, and for conduct interfering with the course of the trial. The judgment of contempt was upheld in *In re Hallinan,* 126 Cal.App. 121 [14 P.2d 797], wherein it is set forth in full. Prior to the adjudication of contempt and during the closing argument of the prosecution, Hallinan had entered into a stipulation with the district attorney that the defendant Egan would be entitled to reserve and have the benefit of any and all possible exceptions and objections to the argument of the prosecuting attorney which could be lawfully made during the course of the argument, and that the defendant Egan would be deemed to have objected and excepted to any and all portions of the closing argument. Hallinan was sentenced to serve twenty-four hours in the county jail, and Tinnin's attorney, Nathan Coghlan, who was then present in the courtroom, was appointed by the court also to represent Egan. Both Coghlan and Egan objected to the appointment, Egan asserting that he desired to represent himself.

Mr. Golden closed his argument at 4:20 on the same afternoon. The court inquired whether written instructions were waived. Mr. Coghlan asked for written instructions. The court recessed until eight o'clock that night. At that hour and again at nine the court announced that the instructions were not completed, and adjourned until ten o'clock the following morning. At the latter hour Hallinan, who in the meantime had been released upon a writ of habeas corpus, sought to resume his duties as defense counsel, but was denied admittance to the courtroom. Defendant Egan personally made a motion that the court permit Hallinan to reenter the proceedings. The motion was denied. The court expressly recognized Egan's desire to represent himself during the instruction of the jury. Upon the completion of the charge the jury retired for deliberations. On the morning of Tuesday, September 6th, the jury announced that it was ready to return its verdict. The court reconvened. Egan again asked that his counsel Hallinan, who was outside, be permitted to return, but permission was denied. Acting Public Defender Gerald Kenny was appointed to represent Egan in the proceeding to receive the jury's verdicts. Mr. Kenny was sent for, entered the courtroom and remained while the verdicts were read, the jury polled, and a date set for judgment, which was a date personally agreed to by Egan. Those pro-

ceedings were completed in about ten minutes. Thereafter Hallinan was permitted to and did appear and resume his representation of Egan. He made and argued a motion for a new trial on behalf of Egan. On September 14, 1932, a date agreed upon, he also appeared with Egan when judgment and sentence were pronounced. Also on behalf of Egan he gave notice of appeal.

The petitioner Egan contends that because of the enforced absence of Hallinan from the courtroom during the last twenty minutes of the closing argument of the prosecuting attorney and until his reappearance, he was deprived of counsel of his own choosing, was compelled to accept codefendant's counsel, and was thereby denied rights vouchsafed him by section 13 of article I of the state Constitution and the Fourteenth Amendment to the United States Constitution. Among other cases he relies on *Glasser* v. *United States*, 315 U.S. 60 [62 S.Ct. 457, 86 L.Ed. 680], and *People* v. *Lanigan*, 22 Cal.2d 569 [140 P.2d 24, 148 A.L.R. 176], wherein, on appeals from the judgments, it was held that the appointment, over objection, of counsel of one codefendant to serve as counsel for the other codefendant, where a conflict of interests was manifest, was a denial of a fundamental right.

The respondents rely on *In re Connor*, 16 Cal.2d 701 [108 P.2d 10], and *Johnson* v. *Zerbst*, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461], as support for their contention that the petitioner's point may not be raised on a proceeding in habeas corpus, but was reviewable only on appeal.

It may be assumed that a petitioner would be entitled to release on habeas corpus if he could show that deprivation of counsel resulted in an unfair trial or in substance in no trial at all. A deprivation leading to such a result would be a violation of his right to counsel under the Constitution of this state, and a failure of due process under the Fourteenth Amendment. But the conclusion may not properly be drawn from the record before us that the petitioner Egan has met the burden in this collateral proceeding of presenting such a case or of showing that there has been any substantial violation of his constitutional rights. It is noted that in each of the joint trials involved in the Glasser and Lanigan cases the attorney for one codefendant, who was appointed by the court to represent the other, acted for both defendants throughout the entire trial. The decisions on the appeals in

those cases that the appointment, made over timely objection, resulted in a deprivation of the constitutional right to counsel, were based upon the presence of a conflict between the interests of the codefendants which prevented a fair trial and the protection of one if unwillingly represented by the attorney for the other. It was indicated in the Lanigan case that, pursuant to decisions such as in *Powell* v. *Alabama,* 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527], the appointment and compulsory representation of both defendants by the counsel of one would be a failure by the trial court to make an effective appointment of counsel so as to amount to a denial of due process and would justify the release of a petitioner in a habeas corpus proceeding. (See, also, *Moore* v. *Dempsey,* 261 U.S. 86 [43 S.Ct. 265, 67 L.Ed. 543] ; *Johnson* v. *Zerbst,* 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461] ; *Walker* v. *Johnston,* 312 U.S. 275 [61 S.Ct. 574, 85 L.Ed. 830] ; *cf. Betts* v. *Brady,* 316 U.S. 455 [62 S.Ct. 1252, 86 L.Ed. 1595].)

It is assumed that the interests of Egan and Tinnin on their joint trial for the murder of Mrs. Hughes were conflicting. Throughout the trial and until the few minutes before the completion of the People's closing argument, Hallinan, counsel of Egan's own choosing, had represented him and given undivided and full personal attention to his defense. The trial commenced on August 8; 1932, and the jury's verdict was returned on the following September 6th. Even during the twenty minutes of the closing argument when Hallinan was absent, Egan's rights were protected by the stipulation theretofore entered into by his own chosen counsel. The petitioner places great reliance on language appearing in the Glasser case, and applied in the Lanigan case, that the right under consideration was a fundamental right and that courts should not indulge in nice calculations as to the amount of prejudice arising from its denial. So here also we are not concerned with nice questions of prejudice. A showing of a substantial deprivation of the right is essential. Unless the petitioner has established such a deprivation he may not prevail in this proceeding.

Tinnin's counsel objected to his appointment as counsel for Egan, but neither he, Egan, nor anyone else, either on the trial, on Tinnin's appeal, or on the previous application for the writ of habeas corpus, considered it necessary or appropriate to raise the objection of conflict of interest. It was

not until after the decision in the Glasser case on January 19, 1942, that the question was raised in this proceeding. Lapse of time in itself would not of course foreclose relief under a proper showing. But here there is an absence of any substantial showing that Egan was denied the benefits of due process. To epitomize: Throughout the trial and until twenty minutes before the end of the closing argument Egan had been represented by counsel of his choice. All of the evidence had been received and his counsel's argument had been made to the jury. The jury had heard all of the arguments except a portion of the People's closing argument. Nothing occurred thereafter to render the appointment of other counsel ineffective. During the short period of Coghlan's service as the appointed counsel for Egan, the latter's rights were protected by the stipulation entered into by Hallinan. The only service Coghlan was called upon to render was his refusal to waive written instructions. Egan's request to represent himself was recognized during the period the instructions were read to the jury. The appointment of Kenny endured for ten minutes while the verdicts were returned and Egan's consent to a date for judgment and sentence was obtained. It is true that Kenny had been called as a witness for the prosecution, but only to establish whether a Mrs. Barton had been a caller at Egan's office on April 30, 1932. Kenny was assistant to Egan as public defender and the friendliest relation between them was apparent. Hallinan was permitted to reenter the case at a point when his client's interests again required his personal attention.

Finally, the petitioners are making a collateral attack on judgments rendered ten years before this particular proceeding was initiated. The burden was upon them to show that they were deprived of some constitutional right. Neither has established such a deprivation on the basis of alleged false testimony given at the trial, and neither has proved that he was deprived of the assistance of counsel in a substantial sense. (*Johnson* v. *Zerbst,* 304 U.S. 458, 468 [58 S.Ct. 1019, 82 L.Ed. 1461].) The court therefore would not be justified in declaring the judgments void.

The writs heretofore issued are discharged and the petitioners are remanded to custody.

Gibson, C. J., Curtis, J., Edmonds, J., Carter, J., Traynor, J. and Schauer, J., concurred.