MARCELINO RIVERA HERNÁNDEZ, Petitioner and Appellant, *v.* NIEVES TARRIDO VÉLEZ, Respondent and Appellee.

No. 12170. Submitted March 20, 1958.—Decided March 24, 1958.

*Vicente Palés Matos* for appellant. *J. B. Fernández Badillo, Attorney General, Arturo Estrella, Assistant Attorney General,* and *Alfredo Archilla Guenard* and *William Fred Santiago, Fiscal* and *Assistant Fiscal of the Supreme Court,* respectively, for appellee.

PER CURIAM.

The defendant-appellant made a suicide pact with his concubine and killed her. Immediately he turned the gun against himself and fired several shots but survived the wounds received. An information charging first-degree murder was filed against him but on the day of the trial it was reduced to second-degree murder. The defendant pleaded guilty of the crime so reduced and was sentenced

to serve from 10 to 20 years' imprisonment in the penitentiary. Some time later he filed a petition for habeas corpus alleging undue legal assistance but the petition was denied. He then filed another petition for habeas corpus alleging that he was not duly assisted by counsel because his attorney had intimidated him in pleading guilty. The second petition was also denied after a hearing on the merits. Feeling aggrieved, the defendant filed the present appeal assigning the following single error:

"The Superior Court, Mayagüez Part, erred in finding that the petitioner-appellant had proper legal representation and that his plea of 'guilty' was voluntary."

 Petitioner's evidence in the habeas corpus proceeding consisted of his own testimony. The *Fiscal* of this Court sums it up as follows:

"He alleged that he is deprived of his liberty as a result of the sentence imposed on him on February 7, 1950, for the crime of second-degree murder. He appeared for trial and was introduced to a gentleman who was to represent him as his attorney. He stated that he had never seen him and did not know who he was. Upon being questioned by the judge, he said that he learned who he was the day he was brought from jail. 'He invited me into a room and then asked me to explain my case. I explained my case to him' (Tr. Evid. 8).

"Upon being questioned by his attorney, he stated that the attorney advised him that 'I ought to plead guilty of second-degree (*sic*), because otherwise it would be my civil death as they were going to give me a life sentence and I would never come out' (Tr. Evid. 8). He stated further that he wanted to defend himself, that he had witnesses, and that his attorney had told him that he was not 'going to handle his case because he was going to lose it.' He stated that the attorney's advice was to plead guilty of second-degree murder, and that he (the attorney) was not going to postpone the case.

"When asked whether he had been frightened by his attorney's statements, he answered in the affirmative. That thereafter he answered in the courtroom all the questions which the judge asked him, under the instructions of his attorney,

and in that manner pleaded guilty of the crime charged (Tr. Evid. 9). He then repeated that the attorney had advised him to plead guilty so as to avoid being sentenced to life imprisonment 'and a civil death.'

"He testified that upon arraignment on October 3, the attorney pleaded not guilty. The petitioner stated that he never waived trial by jury, but it appears from the record that 'at the defendant's request, he is deemed to have waived trial by jury . . .' (Tr. Evid. 12). He went on to say that he did not wish to plead guilty either of first or second-degree murder, that he intended to defend himself. He ended by saying that he did not recall seeing his attorney before the trial and that his plea of guilty was not voluntary, for 'the attorney intimidated me' (Tr. Evid. 13)."

On the other hand, the attorney who represented the petitioner at the trial for murder testified as follows, as summed up by the *Fiscal* of this Court:

"That he was the attorney for the petitioner, that he interviewed the defendant in connection with the trial. He stated that the defendant looked 'depressed,' and that he explained to the defendant 'the situation' as to the trial (Tr. Evid. 20).

"Upon being questioned by the judge, this witness stated that the petitioner had told him that he had killed his wife and that then he (the defendant) had shot himself, 'a sort of a pact.'

"Upon further questioning by the *Fiscal,* this witness testified that 'his state of mind was such that he said to me that he wanted to plead guilty. I concluded that he was a good man and had repented. The man said, "I did it and I must pay for it" (Tr. Evid. 21). Four months elapsed from the arraignment'—he went on to say—'until the trial, and during that period he talked several times with the defendant.'

"Upon being questioned by the judge whether the defendant had witnesses, he answered: 'Well, if he had had any witnesses I would have summoned them. Now, I cannot recall now' (Tr. Evid. 22).

"He also stated that the defendant pleaded guilty of second-degree murder after the classification of the crime was reduced from first-degree murder. He stated that he would have liked to have the case tried, from the material point of view, but

that he explained to the defendant 'the consequences of first-degree murder' (Tr. Evid. 23).

"Upon being asked by the judge, the following dialogue took place:

" 'But the idea of pleading guilty, was it the defendant's or the colleague's?

" 'Well, of both of us; we talked several times in jail. Your Honor, the defendant, according to information received, seemed to be a good person and looked somewhat depressed, as if he had repented.

" 'Did the defendant at any time express his desire to plead guilty? Evidently he did not wish to be tried (Tr. Evid. 24).

" 'Oh, no, no! He did not wish to be tried. He wanted to plead guilty. But he did not wish to be tried' (Tr. Evid. 24).

"Upon cross-examination by the defense, he answered as follows:

"That he had explained, as his attorney, the meaning of first-degree murder. He stated that it would be intimidation on his part to advise him that if he went to trial he would receive a life sentence, unless it was reduced to second-degree murder. I never said to him: 'If you do not plead guilty, you are doomed' (Tr. Evid. 25).

"The following is a literal account of what took place:

" 'Q.—So, it was on account of the penalty that he pleaded guilty of second-degree murder, because it was convenient for him on account of the penalty?

" 'A.—Well, that's logical because life sentence is a heavier penalty. Perhaps it was because of that, but I cannot read his mind.

" 'Q.—Did he explain to you what was his evidence?

" 'A.—He didn't have any evidence.

" 'Q.—But did you investigate?

" 'A.—He himself could not say whether or not he had witnesses. He hardly talked.

" 'Q.—If he didn't talk . . .

" 'A.—I mean that he did not co-operate.

" 'Q.—Did the colleague tell him that the court would be lenient if he pleaded guilty?

" 'A.—That always . . .

" 'Q.—Did you tell him?

" 'A.—I told him.

" 'Q.—Did you advise him to say yes of his own volition when the judge asked him if he pleaded guilty?

" A.—No, because they knew it and if I said anything to them the judge would ask them in order to find out.

" Q.—Then, in what did the defense consist?

" A.—That is the problem, colleague, because he said that I made a good defense.

" 'Q.—Didn't you insist with him that if he went to trial he would get a life sentence?

" 'A.—I didn't tell him anything. He was the one who told me that he wanted to plead guilty. Always, always.

" 'Q.—Always?

" 'A.—Every time I went to see him.

" 'Hon. Judge:

" 'Q.—Colleague, when the judge asked him the routine questions of a plea of guilty, whether there had been any promise or threat, did you tell him how he should answer?

" 'A.—No, sir, how can I act the part of a theater prompter!

" 'Q.—What about before the trial, did you tell him anything?

" 'A.—No, I never did that. Besides, they knew it as well as I did' (Tr. Evid. 25–26).

"Later on the following dialogue took place:

" 'Q.—For what reason did he waive trial by twelve jurors, for what reason?

" 'A.—Well, I can not tell what he had in mind.

" 'Q.—But did he give you any instructions?

" 'A.—Well, I talked with him and we argued and he said that he did not wish to be tried by a jury, that he preferred to be tried by the judge.

" 'Q.—But a while ago you said he did not wish to go to trial.

" 'A.—That he preferred the judge to twelve men.

" 'Q.—Who was the presiding judge?

" 'A.—Willis Ramos' (Tr. Evid. 31).

" 'Finally, the presiding judge questioned the witness as follows:

" 'Q.—Colleague, did you explain to the defendant, before pleading guilty, that if the jury found him guilty of first-degree murder the life sentence would be mandatory, and, if of second-

degree murder, the margin would range from ten to thirty years?

" 'A.—Yes, that it was less.

" 'Q.—Did you explain it to him?

" 'A.—I explained to him that first-degree murder entailed life imprisonment and second-degree murder upwards of ten years; that it was less, but upwards of ten years; but it is impossible for me to remember what I said to every defendant'." (Tr. Evid. 33–34).

In deciding the petition, the judge who took cognizance of the same stated as follows:

"Hon. Judge: If the verdict had been of first-degree murder, the penalty of life sentence is mandatory. If the attorney told you that, he told you the truth . . .

"The Court believes that the petition filed by the petitioner is without merit.

"Among the questions raised, the only one which merits consideration within this proceeding is the contention that the defendant was not duly assisted by counsel.

"On the basis of the testimony of the colleague, Rivera Viñas, which deserves full credit, it seems to us that the defendant was duly assisted by counsel and that he was duly advised by the counsel as to the risk he was running as to the fact that if he were convicted of first-degree murder the mandatory penalty is life imprisonment. This can in no way be considered as intimidation to plead guilty.

"Furthermore, there is an important point involved in this case. This is the second petition for habeas corpus, for there was also a *coram nobis,* and in none of the two previous proceedings the defendant raised the question which he has raised now. Thus, we have no basis to conclude that the defendant's testimony on this point is worthy of credit.

"The petition for habeas corpus is denied (Tr. Evid. 43–44)."

From an examination of the record we are convinced that the petitioner-appellant failed to establish that his legal representation was a mere legal formality, and, consequently, that he was not duly assisted by counsel. *González* v. *Warden,* 79 P.R.R. 41. Nor are we convinced that the attorney's advices to the petitioner constituted intimi-

dation to make him plead guilty of second-degree murder. See *Application of Atchley*, 310 P. 2d 15.

For the reasons stated, the judgment appealed from will be affirmed.